FILED
IN OPEN COURT
AUG 1 7 2026
CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

UNITED STATES OF AMERICA

v.

ANDRELIO CASTAÑO ROJAS,

Defendant.

Criminal No. 2:25-cr-121

**STATEMENT OF FACTS**

The parties stipulate that the allegations in Count One of the pending Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt by admissible and credible evidence, consisting of the following:

1. From January 2018 through March 2025, ANDRELIO CASTAÑO ROJAS conspired to launder proceeds from drug trafficking using a currency exchange scheme, known as the Black-Market Peso Exchange ("BMPE"), where no money physically crossed borders. Colombian Drug Trafficking Money Laundering Organizations (DTMLOs) utilize the BMPE to repatriate their drug proceeds in the form of U.S. currency located in the United States by selling those proceeds for local currency (pesos) in Colombia. DTMLOs use currency brokers to find willing customers, like ROJAS, seeking to purchase U.S. dollars at a Black-Market rate. Working through a Colombian currency broker, ROJAS used pesos obtained from the sale of electronics in Colombia to purchase U.S. currency, which was drug proceeds located in the United States, often in the form of bulk cash. ROJAS himself, and others at his direction, picked up bulk U.S. currency. ROJAS also accepted wire

KPH
AE
ACC

transfers of drug proceeds from third-party accounts into U.S.-based business accounts he controlled.

2. ROJAS knew this money originated from the sale of drugs. Indeed, ROJAS received a more favorable exchange rate by purchasing the U.S. dollars from a currency broker on the BMPE rather than obtaining U.S. dollars through traditional financial institutions at the market exchange rate for the conversion of pesos to dollars.

3. ROJAS used these drug proceeds to purchase consumer electronics from Miami-area wholesale electronics companies. ROJAS exported the electronics to Colombia for sale, thereby moving value back to Colombia. ROJAS sold the electronics in Colombia for Colombian pesos. He used these Colombian pesos to purchase additional U.S. dollars on the BMPE. The currency broker used pesos obtained from customers like ROJAS to pay off the DTMLOs in local currency (pesos).

4. In other words, the BMPE facilitated the conversion of U.S. dollar drug proceeds located in the United States and repatriated drug proceeds to the DTMLOs in Colombia in pesos, without any currency crossing an international boundary. This currency exchange system conceals and disguises the nature, location, source, ownership and control of the drug proceeds.

5. ROJAS had two businesses, Administración Y Servicios G Asociados SAS LLC (AYSG) and Acron Technology (Acron). AYSG and Acron were incorporated in the State of Florida. ROJAS represented AYSG and Acron as companies engaged in the import and export of computer parts.

6. Between January 2018 and March 2023, ROJAS held bank accounts for his two businesses at three U.S. financial institutions, BANK 1, BANK 2, and BANK 3. ROJAS used his

K8M



AE
ACC

Colombian passport as his identification to open each of these three U.S. accounts. All three accounts have since been closed.

7. In October 2020, ROJAS established a business relationship with BUSINESS 1, a wholesale electronics company in the Miami area. ROJAS used the same Colombian passport as he did with the three U.S. financial institutions in his application to BUSINESS 1. Between October 2020 and March 2025, ROJAS arranged for BUSINESS 1 to accept wires and bulk U.S. currency, representing drug proceeds, as payment for consumer electronics. BUSINESS 1 shipped and exported the electronics to one or more of ROJAS's businesses in Colombia.

8. Between January 2018 and November 2021, ROJAS arranged for his U.S. bank accounts at BANK 1, BANK 2, and BANK 3 to receive drug proceeds in U.S. dollars, which ROJAS purchased from currency brokers in Colombia using Colombian pesos. ROJAS used a portion of those drug proceeds to purchase consumer electronics, such as hard drives and memory sticks, from BUSINESS 1 that were then exported to Colombia for sale.

9. For example, on June 9, 2021, a Drug Enforcement Administration (DEA) special agent acting in an undercover capacity met with a DTMLO courier in the Sandston area of Henrico County, which is the Eastern District of Virginia, to pick up $149,980 in bulk U.S. currency representing drug proceeds. This currency was concealed in a black and pink bag. The vast majority of the currency was in $20 bills, which is indicative of street-level drug sales.

10. DEA subsequently deposited this $149,980 in U.S. currency into an undercover account in the Norfolk, VA, which is the Eastern District of Virginia. Then, upon instructions from the DTMLO via its money broker, the funds, less a three percent (3%) commission, were

KPH



AE

ACC

wired onwards to three companies. One of those wire transfers was in the amount of $20,000 to AYSG, ROJAS's company, specifically AYSG's account at BANK 2. ROJAS had previously purchased the $20,000 in drug proceeds from a currency broker in the manner outlined above. ROJAS knew that these funds were drug proceeds. Soon after that, on June 14, 2021, ROJAS transferred $36,000 from his AYSG account at BANK 2, which included the aforementioned $20,000, to BUSINESS 1. This transfer of drug proceeds was for the purpose of ROJAS acquiring consumer electronics to sell in Colombia.

11. In another example, on August 12, 2021, a DEA taskforce officer (TFO) acting in an undercover capacity met with a DTMLO courier (COURIER 1) in Bexar County, Texas to pick up $150,360 in bulk U.S. currency representing drug proceeds. This currency, consisting mainly of $10 and $20 bills, was concealed inside a gray paper bag.

12. DEA subsequently deposited this $150,360 in U.S. currency into the same undercover account referenced above. Then, upon instructions from the DTMLO via its money broker, the funds, less a three percent (3%) commission, were wired onwards to four companies. Two of those wires, totaling $52,161, went to ROJAS's AYSG account at BANK 3. ROJAS had previously purchased this $52,161 from a DTMLO in the manner outlined above. ROJAS was aware that the funds were drug proceeds. Approximately one week later, ROJAS transferred $30,000 over the course of two transactions from his AYSG account at BANK 3 to BUSINESS 1. This transfer of drug proceeds was for the purpose of ROJAS acquiring consumer electronics to sell in Colombia.

13. In addition to the two bulk currency pickups and subsequent transfers detailed above, ROJAS's AYSG bank accounts received an additional $114,668 received from two other

KPL
AE
Ace

bulk currency pickups, one of which occurred in May 2021 in Cook County, Illinois and the other of which occurred in June 2021 in Bexar County, Texas. The June 2021 pickup in Texas also involved COURIER 1 dropping the currency off to a DEA undercover TFO. As with the two cash pickups described above, the currency here constituted drug proceeds and ROJAS, knowing that the funds were drug proceeds, sent a substantial portion of the funds onwards from his AYSG bank accounts to BUSINESS 1.

14. Meanwhile, on August 19, 2021, COURIER 1 was stopped by law enforcement, who recovered approximately 1.2 kilograms of cocaine and 15.5 kilograms of marijuana from the vehicle COURIER 1 was operating. Law enforcement obtained a search warrant for COURIER 1's residence in Bexar County, Texas and there recovered an additional quantity of cocaine, 40 bundles of plastic bags containing marijuana, approximately 12 kilograms of marijuana edibles, a total of $85,103 in U.S. currency, one pistol, and one AR style rifle. Leading up to August 19, 2021, DEA had picked up bulk U.S. currency from COURIER 1 on four occasions.

15. ROJAS's business accounts for AYSG received funds from DEA undercover accounts into which drug proceeds received from DEA undercover bulk currency pickups had been deposited from February 2017 to March 2023. ROJAS's business accounts for Acron also received funds from DEA undercover accounts into which drug proceeds received from DEA undercover bulk currency pickups had been deposited from October 2020 to March 2023.

16. In addition to receiving drug proceeds via bank wires, between May 2021 and March 2025, ROJAS delivered and arranged others to deliver on his behalf bulk U.S. currency to BUSINESS 1 for the purpose of purchasing consumer electronics. At ROJAS's direction, BUSINESS 1 then exported the consumer electronics to one or more of ROJAS's business



KDH

AE ACC

in Colombia. The most recent of these deliveries of bulk U.S. currency occurred on March 14, 2025. ROJAS personally delivered a portion of this U.S. currency to BUSINESS 1. The remaining portion of this bulk U.S. currency was delivered by five different individuals, each of whom BUSINESS 1 listed on the IRS Form 8300 (Report of Cash Payments Over $10,000 Received in a Trade or Business) as a "friend of the owner," referring to ROJAS. ROJAS also confirmed to BUSINESS 1 in e-mails that the five individuals made the cash deliveries on his (ROJAS's) behalf.

17. ROJAS acknowledges that the foregoing statement of facts contains those facts necessary to support the plea agreement between ROJAS and the United States. It does not describe all of his conduct related to the offense to which he is pleading guilty, or the offenses charged in this case, nor does it identify all of the people with whom he may have engaged in illegal activities.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

Kevin Hudson
Assistant United States Attorney

Margaret A. Moser
Chief, Money Laundering, Narcotics and
Forfeiture Section

Mark Irish
Senior Trial Counsel
Yuliana Reyes
Trial Attorney

KM



AE Ace

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Andrelio Castaño Rojas, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Andrelio Castaño Rojas

I am Andrelio Castaño Rojas's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Amanda Conner
Counsel for Andrelio Castaño Rojas